IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAZARETH HOSPITAL and | : | CIVIL ACTION |
| ST. AGNES MEDICAL CENTER | : | |
| v. | : | No. 10-3513 |
| KATHLEEN SEBELIUS, Secretary | : | |
| Department of Health and Human Services | : | |

**MEMORANDUM**

Ludwig, J.                                                                            April 8, 2013

This action reviews the decision of the Secretary of the Department of Health and

Human Services Kathleen Sebelius, dated September 11, 2012, as issued by the

Administrator of CMS (Centers for Medicare and Medicaid Services). That decision

followed the July 12, 2012 remand of the case to the agency by this court (doc. no. 40). It

affirmed the May 17, 2010 determination by CMS, which had in turn affirmed the March 23,

2010 determination of the PRRB (Provider Reimbursement Review Board). Jurisdiction:

review, 42 U.S.C. § 1395oo(f)(1); federal question, 28 U.S.C. § 1331.

The Secretary's decision denied plaintiffs' statutory claims for Medicare payments for

serving a disproportionate share of low-income patients during 2002, known as "DSH

adjustments,"[1] Section 1886(d)(5)(F)(vi) of the Social Security Act (Act), 42 U.S.C. §

1395ww(d)(5)(F)(vi) – as to Nazareth, $250,751; St. Agnes, $312,520.

---

[1] Our Court of Appeals upheld the Secretary's refusal to include hospital services provided under New Jersey's Charity Care Program in the calculation of Medicare DSH adjustments. Cooper Univ. Hosp. v. Sebelius, 636 F.3d 44 (3d Cir. 2010), aff'g, 686 F. Supp. 2d 483 (D.N.J. 2009) (Simandle, J.). Under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), the Secretary's interpretation was held to be a permissible construction of an ambiguous statute requiring deference. Id., 686 F. Supp. 2d at 484, 489-90, 497-98 & n.22. The proper interpretation of the Medicare DSH statute is not presented here. Instead, plaintiffs challenge defendant's promulgation and application of the regulation implementing that statute. But as in Cooper, resolution of the difficult legal issues presented requires "an analysis of the interaction between, and the intersection of the Medicare and Medicaid statutes." 636 F.3d at 45; see id., 686 F. Supp. 2d at 484-87 (discussion).

This case is unlike Cooper Univ. Hosp. v. Sebelius, 636 F.3d 44 (3d Cir. 2010).  The substantive issue here is whether denial of Medicare DSH payments for services to specified low-income individuals under Pennsylvania's CMS-approved Medicaid state plan was fair and reasonable given clear Constitutional requirements and the standards of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706.  Plaintiffs contend (1) the denial violated principles of equal protection and was, therefore, Constitutionally impermissible, and (2) it was arbitrary and capricious under the APA.  For the reasons now discussed, plaintiffs' position will be upheld.

Plaintiffs' motion for summary judgment (doc. no. 16) asserts that under the regulation implementing the Medicare DSH statute, as amended, 42 C.F.R. § 412.106(b)(4) (2000), there are two "diametrically opposite" interpretations of the statute's requirements. Both, they say, are unreasonable and as a matter of Constitutional law disadvantage them. Pls. supp. br. (doc. no. 77 at 4-6); pls. submission on remand, supplemental admininistrative record (SAR) 85-86, 88-94.  First, the regulation precludes Medicare DSH adjustments for days of inpatient hospital services to low-income general medical assistance (GA) patients not eligible for Medicaid.  Second, it permits those adjustments in states serving similar low-income patients engaged in a Section 1115 waiver project[2] under Subchapter XI, Section 1115

---

[2]  The statute empowers the Secretary to waive requirements of a state's Medicaid plan for "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of Subchapter . . . XIX [Medicaid] . . . ." 42 U.S.C. § 1315(a)(1). And the "costs of such project . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures" under the state plan.  Id. § 1315(a)(2)(A);  42 C.F.R. § 430.25(d)(1).  ("Section 1115," "waiver," and "expansion" will refer here to these projects and their patient populations.  In some instances, references appear in original materials as "section," "title," and "subchapter."  All are capitalized).

of the Act, 42 U.S.C. § 1315 – and this is without regard to the patient's eligibility for Medicaid.[3]

In 2010, plaintiff hospitals sued defendant Secretary for Medicare DSH adjustments for fiscal year 2002, together with statutory interest under 42 U.S.C. § 1395oo(f)(2).  Pls. supp. br. (doc. no. 77 at 20, 28, 42); pls. supp. sur-reply br. (doc. no. 86 at 2-3).

Defendant cross-moved for summary judgment (doc. no. 21).  Defendant's argument is that the challenged decisions involved two separate groups of individuals who are classified differently under the Act and who receive medical assistance through dissimilar programs.  Therefore, there was no Constitutional or APA violation.  The cross-motion reasserts procedural and other grounds previously ruled on in this case.[4]  Its foremost point is that "the result here is axiomatic in view of the dispositive decision in <u>Cooper</u>"; and "to include GA patients in the Medicare DSH calculation is not authorized by law."  Def. supp. br. (doc. no. 79 at 1), def. supp. reply br. (doc. no. 83 at 16).  This memorandum disagrees.

<u>Agency Record Prior to July 12, 2012 Remand</u>

For fiscal year 2002, plaintiffs' reports to the Intermediary listed costs of inpatient hospital services that were *partially* reimbursed by Medicare and Medicaid DSH adjustments.

---

[3]  GA patients – for the most part childless adults – are not eligible for  Medicaid benefits under Sections 1902(a)(10)(A) & (C) and 1905(a) of the Act, 42 U.S.C. §§ 1396a(a)(10)(A) & (C), 1396d(a).  Also, their income and resources typically fall significantly below those of Medicaid and Section 1115 beneficiaries.

[4]  Defendant also repeats the contention that no jurisdiction exists because plaintiffs did not timely present the Constitutional and APA issues to the agency.  Def. supp. br. (doc. no. 79 at 2 & n.1); Oct. 15, 2012 letter of def. counsel (doc. no. 65).  However, the administrative record as well as the filings in this litigation show that plaintiffs timely challenged the amended Medicare DSH regulation.  <u>See</u> July 11, 2012 order (doc. no. 40 at 1); Aug. 7, 2012 supp. mem. (doc. no. 47 at 2 & n.1); Oct. 16, 2012 mem. (doc. no. 66 at 4 & n.6, 11-12 & n.12).

Pennsylvania's Medicaid state plan included a Medicaid DSH in the form of a state-specific, lump sum allotment that was distributed to eligible hospitals such as plaintiffs.[5]  The state plan amendment at issue here paid additional Medicaid DSH directly to plaintiff hospitals[6] – Nazareth about 57 percent of actual costs and St. Agnes about 62 percent.  Coyle decl. ¶ 35, SAR 114 (see Coyle's qualifications, SAR 106); pls. supp. br. (doc. no. 77 at 30 n.24).

In their reports as to Medicare DSH adjustments, plaintiff hospitals included costs of hospital services for GA inpatients along with costs for Medicaid inpatients.  They did so in protest against policies stated in CMS's Program Memorandum (PM) A-99-62[7] and the regulation implementing the Medicare DSH statute, 42 C.F.R. § 412.106(b)(4).  On May 12, 2004 and August 20, 2004, respectively, the Intermediary notified plaintiffs that the claimed GA days were ineligible as "only State supplementation" and would not be counted – which

---

[5]  The Medicaid statute called for DSH adjustments.  States participating in Medicaid must take into account "the situation of hospitals which serve a disproportionate number of low-income patients with special needs" in the calculation of rates of payment to hospitals.  Section 1902 of the Act, 42 U.S.C. § 1396a(a)(13)(A)(iv).  A hospital qualifies for Medicaid DSH allotments based on statutory requirements. See Section 1923 of the Act, 42 U.S.C. § 1396r-4(b).  The allotment is based on services to Pennsylvania's medical assistance patients – both Medicaid and GA. Id.; see Cooper, 686 F. Supp. 2d at 486-87 ("Medicaid DSH will generally be based upon a wider population of low-income patients than will the Medicare DSH reimbursement").  See Pa. Medicaid state plan, Attachment 4.19A at 16-17, supplemental administrative record (SAR) 918-920, discussed infra.

[6]  State plan amendment (SPA) 94-08, Attachment 4.19A at 25-26, SAR 955-956, is discussed infra.

[7]  In December of 1999, CMS's policy was changed:  costs for inpatient hospital days reimbursed under a state plan through Medicaid DSH adjustments would not be counted in the Medicare DSH calculation, and the Medicare DSH statute's "focus [was] on the patient's eligibility for Medicaid benefits as determined by the State . . . . Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid . . . ." Program Memorandum (PM) A-99-62, AR 572, 570-577.  In effect, CMS recognized that prior to fiscal year ending 1999, hospitals had routinely been permitted to count GA days funded through Medicaid DSH for purposes of the Medicare DSH calculation.  PM A-99-62, AR 571-573.

reduced the Medicare DSH payments.  Intermediary's position papers and notices of program

reimbursement, administrative record (AR) 467-470, 475-476, 516-518, 828-846 (Nazareth);

AR 322-325, 329-330, 333-335, 373-375, 813-822 (St. Agnes).

Plaintiffs appealed the Intermediary's determination to the PRRB – Nazareth on

August 25, 2004, and St. Agnes on February 17, 2005.  AR 825-846; AR 35 & n.1, 809-822.

On February 29, 2008, Nazareth's case was heard on stipulated facts.  AR 36-37, 82-83;

2/29/08 PRRB Hr'g, N.T. 7:22-25, AR 63.  Nazareth cited the Medicare DSH statute, 42

U.S.C. § 1395ww(d)(5)(F)(vi)(II) ("number of the hospital's patient days for such period

which consist of patients who (for such days) were eligible for medical assistance under a

State plan approved under Subchapter XIX [Medicaid] . . . .").  Nazareth had contended that

this statutory phrase meant it should receive reimbursement because Pennsylvania provided

hospital services to low-income, non-Medicaid-eligible inpatients through a Medicaid state

plan approved by CMS.  See 2/29/08 PRRB Hr'g, N.T. 11:18-12:16, 14:9-15:9, 28:9-25, AR

64-65, 68.  (Plaintiffs acknowledge that this issue is now moot, given Cooper's holding that

defendant's interpretation of the Medicare DSH statute was not improper.[8])

In a final position paper, Nazareth also contended that it was unfair to disallow its

costs for low-income GA inpatients. Reason: similar hospital costs were compensated under

the  Medicare  DSH  statute  as  implemented  by  the  amended  regulation,  42  C.F.R.  §

---

[8]  Cooper, 686 F. Supp. 2d at 491-92 ("CMS reasonably determined that the [Medicare DSH]
incorporates the definition of 'medical assistance' from the Medicaid statute."); id. at 486 ("'medical
assistance' is defined in Title XIX as payment for certain designated services to either 'categorically needy'
or 'medically needy' persons").  See Sections 1902(a)(10)(A) & (C) and 1905(a) of the Act, 42 U.S.C. §§
1396a(a)(10)(A) & (C), 1396d(a) (17 categories of Medicaid eligibility).  Plaintiffs acknowledge as much.
See Feb. 15, 2011 letter of pls. counsel (doc. no. 8); pls. br. (doc. no. 17-1 at 30-31 & n.19).

412.106(b)(4) (2000), in states that had obtained a waiver of Medicaid eligibility requirements for patients served by a Section 1115 project.[9]  Under this view, both Pennsylvania's state plan and other states' Section 1115 waiver projects served low-income persons who were not eligible for Medicaid, and both used federal funds to do so.[10]

On March 23, 2010, the PRRB upheld the Intermediary's disallowance of the costs claimed for GA inpatients.  PRRB decision, AR 33-41.  CMS notified plaintiffs that the PRRB's determination would be reviewed on the Administrator's own motion and advised them of the right to submit comments, which plaintiffs did on April 27, 2010.[11]  AR 17-21, 28-29.

On May 17, 2010, CMS's Administrator affirmed the PRRB's ruling.  AR 2-16.  It determined that hospital services for GA inpatients "are for patients who are not eligible for

---

[9]  Nazareth:  "CMS needs to review and evaluate each individual state plan on an on-going basis as approved and re-approved to determine whether or not general assistance days are included in the approved state plan.  A perfect example are states with a [Section] 1115 waiver, which could include general assistance days which would be includable per 42 CFR 412.106(b)(4)(i) . . . . [S]ome states are able to include general assistance days in DSH ([Section] 1115), and some are not (traditional Title XIX).  Will it take Congressional action to resolve this issue again, or will CMS act to bring uniformity to the industry[?]"  AR 631; see also 2/29/08 PRRB Hr'g, N.T. 14:9-16, 26:11-27:2, AR 65, 68.

[10]  On January 20, 2009, St. Agnes requested that its case be consolidated with Nazareth's appeal; and this request was granted.  AR 35 n.1, 42.  In position papers to the PRRB, St. Agnes presented largely the same arguments as Nazareth's.  AR 204.

[11]  They specifically asserted that the PRRB's refusal to count the claimed GA days in the Medicare DSH calculation was arbitrary and capricious and violated their Constitutional rights to equal protection.  AR 18-20.  Plaintiffs:  "[W]hether an agency interpretation that results in arbitrarily and capriciously treating like parties in a different fashion violates the APA is separate and distinct from whether an agency's interpretation of a statute would otherwise be entitled to deference under Chevron [467 U.S. at 842-43] . . . .  Moreover, because there is no rational basis for treating hospitals caring for large volumes of low-income patients in Pennsylvania less favorably than those located in [Section] 1115 States, the Secretary's interpretation also violates Providers' equal protection rights . . . ."  Apr. 27, 2010 letter of pls. counsel, AR 19-20.

Medicaid but rather are only eligible for State general assistance." AR 12 & n.26. Also, the

Medicare DSH statute "requires that for a day to be counted, the individual must be eligible

for 'medical assistance'" under the Medicaid statute. AR 13-14. The Administrator did not

heed plaintiffs' April 27, 2010 comments, concluding that GA "days are not counted as

Medicaid days for purposes of the Medicare DSH calculation."[12] AR 2-3, 14-15.

The Administrator did not consider the rationales for amending the implementing

regulation, 42 C.F.R. § 412.106(b)(4) (2000). That amendment permitted all inpatient

hospital days funded under a Section 1115 waiver project to be counted in the Medicare DSH

calculation – regardless of a patient's eligibility for Medicaid.[13] See pls. Apr. 27, 2010

comments, AR 18-20 (rationales). As stated by the Secretary in 2000, the purpose was to

compensate providers through Medicare DSH adjustments for the costs of services to Section

---

[12] CMS's Administrator did so based primarily on a faulty interpretation of the Medicare DSH statute: "Section 1886(d) [Medicare DSH statute] clearly states that the patients' Title XIX [Medicaid] eligibility for that day is a requirement for inclusion in the Medicare DSH calculation." AR 14-15. Compare Medicare DSH statute: "patients who (for such days) were eligible for medical assistance under a State plan approved under Subchapter XIX . . . ." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Cooper held that the statute is ambiguous. See footnote 1 supra.

[13] Moreover, CMS's Administrator concluded that the Medicare DSH regulation, as amended, 42 C.F.R. § 412.106(b)(4) (2000), did not apply during fiscal year 2002: "[T]he Secretary's policy was to include in the Medicare DSH calculation, only those days for populations under the Title XI [Section 1115] waiver who were or could have been made eligible under a State plan." AR 10. The Administrator also erred in finding that under the amended regulation "for a day to be counted [in the Medicare DSH calculation], the individual must be eligible for 'medical assistance' under Title XIX. That is, the individual must be eligible for the Federal government program also referred to as Medicaid." AR 13-14 (emphasis in original; footnote omitted). Instead, as stated by the Secretary in January 2000: "[T]he Section 1115 waiver may provide for medical assistance to expanded eligibility populations that could not otherwise be made eligible for Medicaid." 65 Fed. Reg. 3136, 3136 (Jan. 20, 2000), rulemaking records (RR) 1-2 (doc. no. 74 at 1-2). As amended in 2000, the Medicare DSH regulation did not require a Section 1115 patient's eligibility for Medicaid, as had previously been promulgated in PM A-99-62.

1115 patients who could not otherwise have been made eligible for Medicaid. Interim final rule, 65 Fed. Reg. 3136, 3137, 3139 (Jan. 20, 2000), rulemaking record (RR) 1-2, 4 (doc. no. 74 at 1-2, 4); final rule, 65 Fed. Reg. 47054, 47086-47087 (Aug. 1, 2000), RR 46, 78-79 (doc. no. 75 at 33-34).

### Record on July 12, 2012 Remand

On remand, CMS's Administrator asked plaintiffs, BlueCross BlueShield Association (BCBS) – the Medicare Administrative Contractor now assigned to plaintiffs' cases – and CMS's Director of Hospital and Ambulatory Policy Group to "respond with supporting documentation" to three questions.[14] The responses "would be included in the record and considered in making the required findings and conclusions." SAR 211-212. Each responded;[15] but supporting evidence was submitted only by plaintiffs. SAR 82-151.

As approved by CMS for fiscal year 2002,[16] Pennsylvania's Medicaid state plan contained state plan amendment (SPA) 94-08, Attachment 4.19A at 25-26, entitled "Methods

---

[14]   The three questions: "How were plaintiff hospitals compensated for inpatient services in Pennsylvania's General Assistance program in FY 2002? Were costs of inpatient hospital services arising from Pennsylvania's GA program the same or different from those incurred in Section 1115 demonstration projects in other states? Were GA inpatients in Pennsylvania hospitals the same or different from hospital inpatient populations in other states via a Section 1115 demonstration project, and, if so, how?" July 11, 2012 order (doc. no. 40 at 2).

[15]   CMS's representative, the Director, did not respond specifically to the remanded questions. SAR 67-81. Instead, CMS reasserted that Pennsylvania's GA program is "a 'state-only' program" and the claimed inpatient hospital services were "state-only days . . . neither part of the Medicaid program . . . nor part of an 1115 demonstration project." SAR 74. CMS did not submit testimony, sworn statements, or other documentary evidence not already contained in the record.

[16]   CMS included in the supplemental record a copy of Pennsylvania's Medicaid state plan from the State Bureau of Policy Analysis and Planning. SAR 1-3, 40 n.39, 215-1454. This comprises Attachment 4.19A, SAR 889-1010, of which SPA 94-08 is a part, SAR 955-956. CMS's approval is noted on SPA 94-08. See also Coyle decl. ¶¶ 7-10, 13, SAR 107-109, 120-121.

and Standards for Establishing Payment Rates–Inpatient Hospital Care" – "Additional Disproportionate Share Payment."  SAR 955-956; Piper report at 2, SAR 132 (see Piper's qualifications, SAR 141).  That amendment pertained to hospitals serving "a large number of Medicaid and medical assistance eligible, low[-]income patients, including those eligible for general assistance, who[m] other providers view as financially undesirable." Attachment 4.19A at 25, SAR 955; Coyle decl. ¶¶ 8, 13, SAR 107, 109; Piper report at 2, SAR132.  It also set forth eligibility criteria as to a patient's low-income ceiling in order for hospital inpatient care to be covered under Pennsylvania's Medicaid plan.[17]  Attachment 4.19A at 25, SAR 955; Coyle decl. ¶¶ 8-11, SAR 107-108; see also stipulations before the PRRB, ¶¶ 2, 5, AR 83.[18]  Under SPA 94-08, plaintiffs cooperated in the delivery of inpatient care to low-income individuals who were not eligible for Medicaid in Pennsylvania.[19]

For fiscal year 2002, as noted, plaintiffs were partially reimbursed for their costs of inpatient hospital services under SPA 94-08.  Those payments were federal funds under

---

[17]  GA applicants must "demonstrate to the [Pa. Department of Public Welfare (DPW)] that their household income and resources do not exceed the income and resource standards established by the Department such standards being equal to or more restrictive than those for the Aid to Families with Dependent Children (AFDC) program." Attachment 4.19A at 25, SAR 955. Furthermore:  "Each hospital will determine those patients who qualify as low-income persons eligible for additional payments by a verifiable process subject to the eligibility conditions set forth above."  Id.; Coyle decl. ¶ 10, SAR 108.

[18]  In addition, the parties before the PRRB stipulated to other aspects of Pennsylvania's general medical assistance program – including non-hospital and cash assistance services, which were funded solely by the Commonwealth and are not germane to the inpatient hospital care at issue here.  See Stipulation ¶ 3, AR 83 (referring to an "alternate formula" that is not SPA 94-08's method for DSH payments).  See Coyle decl. ¶¶ 15-18, SAR 109-110; Piper report at 2, SAR 132.

[19]  "A disproportionate share hospital [DSH] for purposes of receiving additional disproportionate share payments under this provision is any hospital that furnishes medical care to a qualified low-income person without expectation of payment from the person due to the patient's inability to pay as documented by his or her having met the income and resource standards as set forth above."  Attachment 4.19A at 25, SAR 955.

Sections 1903 and 1905 of the Act, 42 U.S.C. §§ 1396b, 1396d.  Piper report at 1-4, SAR 131-134; Attachment 4.19A at 25-26, SAR 955-956.  Some funds used to cover actual costs also came from Medicaid DSH allotments under Section 1923 of the Act, 42 U.S.C. § 1396r-4 and from plaintiff hospitals.  Coyle decl. ¶¶ 34-38, 40-41, SAR 113-115.

Pennsylvania's Medicaid agency, its Department of Public Welfare (DPW), and Medicaid managed-care organizations paid hospitals for Medicaid and GA patient care in the same way.[20]  Coyle decl. ¶¶ 22-27, SAR 111-112.  "Identical payment rates appl[ied] for traditional Medicaid beneficiaries and . . . GA program recipients in Pennsylvania."  Id. at ¶¶ 22, 24, SAR 111.  For fiscal year 2002, "Pennsylvania Medicaid used the Medicare version 19 DRG[21] grouper to calculate the payment for inpatient hospital services . . . using a hospital-specific base rate per case, multiplied by the applicable DRG case weight, per the applicable DRG table for both GA patients and traditional Title XIX Medicaid patients."[22]  Id. at 25, SAR 111; Piper report at 9, SAR 139.

---

[20]  SPA 94-08:  "For each hospital, such adjustment shall be paid in the normal medical assistance or intermediary payment process and according to rates or fees established by the Commonwealth for fee-for-service program services or by the intermediary for its services."  Attachment 4.19A at 26, SAR 956; Coyle decl. ¶ 23, SAR 111.

[21]  "DRG" refers to rates used to determine federal payments to hospitals under Medicare and Medicaid.  These are predetermined, nationally-applicable, fixed per-case rates based on specific diagnosis-related groups, which are assigned to each case on discharge.  See 42 U.S.C. § 1395ww(d)(1)-(4).

[22]  Reimbursements under SPA 94-08:  "[T]hese payments are made in the same amount as, and are identical in all respects to, the DRG payments Pennsylvania hospitals receive for patients eligible for Medicaid . . . .  [F]rom a Pennsylvania hospital's perspective, these payments are no different than the payments received for Medicaid-eligible medical assistance recipients."  Piper report at 9, SAR 139.  Defendant concurs that medical assistance payments for GA patients are made by "the DRG-based payment methodology."  Adm. supp. decision, SAR 38.

Under Pennsylvania's Medicaid state plan in fiscal year 2002, medical coverage was the same for GA patients and others eligible for the Medicaid program.  Coyle decl. ¶ 5, SAR 106.  Both categories of patients were "treated exactly the same way."  Id. ¶ 6, SAR 107.  Plaintiffs processed roughly the same proportion of Medicaid and GA cases – at the same cost for comparable levels of illness.  Coyle decl. ¶¶ 26-27, SAR 112; id. ¶ 48, SAR 116 ("no material difference in the types of patients or acuity of care . . . that turns on whether their medical assistance . . . [wa]s funded" under Medicaid or GA).  Because the same rates of payment applied to Medicaid and GA patients for comparable illnesses, plaintiffs lost the same amounts of money in treating both categories of patients.

As to cost-reporting, Pennsylvania's DPW and its hospitals did not distinguish between costs or other statistics for Medicaid and GA patients – "all such patient days, cases, costs, and charges [were] equally reported as undifferentiated Pennsylvania medical assistance activity."  Coyle decl. ¶ 28, SAR 112; id. ¶¶ 28-32, SAR 112-113.  "Indeed, the sole and exclusive reason for a Pennsylvania hospital to differentiate traditional Medicaid and GA patient statistics is CMS's differential treatment of the two categories . . . for purposes of performing the Medicare DSH calculation . . . ."  Id. ¶ 31, SAR 113.

Also, there was no significant difference between costs of inpatient hospital services for GA patients as compared to Section 1115 waiver patients not eligible for Medicaid.  Coyle decl. ¶¶ 47-48, SAR 116.  Plaintiffs illustrated this point using a "sister" hospital – St. Francis Hospital in Wilmington, Delaware.  Id. ¶¶ 43-44, SAR 115.  Delaware Medicaid is

11

administered as a Section 1115 waiver program.  Allowable costs were dealt with similarly whether funded through Pennsylvania's SPA 94-08 as part of its Medicaid state plan or through a Section 1115 waiver project.  Id. ¶ 47, SAR 116.  CMS permitted St. Francis – like every other hospital in Delaware or other Section 1115 waiver states – to include all days funded through the state's medical assistance program in the Medicare DSH calculation.  But Nazareth and St. Agnes were not permitted to do so for a greater number of comparable and even lower-income GA patients.[23]  "Had the Plaintiff Hospitals been located just a few miles away, in Delaware, such as their affiliated hospital, St. Francis, these additional sums all would have been paid."  Id. ¶ 42, 49, SAR 115-116.  This afforded Delaware hospitals a significant financial and competitive advantage over Pennsylvania hospitals.  Coyle decl. ¶¶ 49-54, SAR 116-118.

In at least 10[24] of the 44 states that currently utilize Section 1115 waiver programs, inpatient hospital services for low-income, non-elderly adults – i.e., patients comparable to

_____

[23] Nazareth, St. Agnes, and St. Francis were members of Catholic Health East.  All three used the same patient accounting software and performed all billing from a combined central business office.  The only pertinent difference was the greater volume of costs that St. Francis was permitted to claim under the Medicare DSH statute.  Coyle decl. ¶¶ 45-46, 48-49, SAR 115-116.  See also pls. submission on remand, SAR at 101-102 ("Delaware's expansion population is even broader than, but would include the Plaintiff hospitals' population of indigent childless adults who would be covered under the Pennsylvania GA program were St. Francis located in Pennsylvania.").  For "Catholic Health East (FYE 2002-2010), the cumulative total DSH payments withheld due to the exclusion of GA days is $4,466,558."  Coyle decl. ¶ 39, SAR 114.

[24] Arizona; Delaware; Hawaii; Iowa; Maine; Massachusetts; Minnesota; New Mexico; New Jersey; and Wisconsin.  Piper report at 1, 6-9, SAR 131, 136-139.  Under New Jersey's waiver program, hospital inpatient services are covered under more restrictive limits than in Pennsylvania.  Id. at 10, SAR 140.  As of February 2000, "the HHS Secretary had approved twelve (12) waivers under Section 1115 integrating coverage of Medicaid-eligible and non-Medicaid eligible individuals."  Id. at 8, SAR 138.  See also Adm. supp. decision, SAR 45 & n.49 ("of those [Piper] identified, five were originally approved, in some form, prior to or by 2002," but about "20 . . . nonfamily planning [Section] 1115 demonstrations were originally approved in some form prior to or by 2002").

those served by Pennsylvania's GA program – are funded with federal matching payments under Sections 1903 and 1905 of the Act, 42 U.S.C. §§ 1396b, 1396d.  Piper report at 3, 5, SAR 133, 135.  Hospitals in nine of those states were also permitted to count days of service to non-Medicaid-eligible expansion patients in the Medicare DSH calculation.  Piper report at 6-9, SAR 136-139.  Most, if not all, Pennsylvania GA patients would be eligible for inpatient hospital care under these waiver programs, if residents of those states.  Id.

States typically use Medicaid DSH allotments under Section 1923 of the Act, 42 U.S.C. § 1396r-4, to pay for services to non-Medicaid-eligible Section 1115 expansion patients under budget-neutral principles – "[t]hat is, projected federal spending under the waiver is expected to be no more than projected federal spending under the traditional Medicaid State Plan program."[25]  Piper report at 5-6, 11, SAR 135-136, 141.

As BCBS agreed, plaintiffs were paid for hospital services to GA inpatients in 2002 "using the same methodology as categorically or medically needy Medicaid beneficiaries." SAR 154.  It also found no significant distinction between inpatients receiving care under a Section 1115 waiver and those receiving care under Pennsylvania's state plan:  its comment was – "it appears possible that inclusion of the Pennsylvania GA categories may have been approved in a [Section] 1115 waiver request, all things being equal . . . ."[26]  SAR 155.

---

[25]  "[I]t is . . . common for Medicaid DSH funding to be redirected and become a payment source for inpatient care for non-Medicaid eligible Section 1115 expansion patients," and those funds "often are redirected under budget neutrality principles as a primary payment source for inpatient care."  Piper report at 6, 11, SAR 136, 141.  See also Adm. supp.  decision, SAR at 23 n.15 (one of the most "prominent" sources for funding waiver programs is Medicaid DSH "funding diverted from . . . hospitals").

[26]  Yet BCBS incorrectly found "the [Section] 1115 analogy to a GA program" to be inapposite because the GA "inpatient benefit was limited to one stay a year."  SAR 154-155.  See discussion infra.

Rulemaking Record

The rulemaking record is not large – it includes the January 20, 2000 interim final and August 1, 2000 final rules as published in the Federal Register; public comments from 11 hospitals; and the Medicare Payment Advisory Commission (MedPAC), Report to Congress: Medicare Payment Policy (March 2000), which "HHS considered."  Nov. 20, 2012 letter of def. counsel (doc. no. 73 at 2); MedPAC report, RR 203-383 (doc. no. 75 at 159-338).  The record does not contain a discussion of the MedPAC report.[27]  Defendant certified these materials to be the complete record.  Nov. 9, 2012 letter of def. counsel (doc. no. 71).

The sole record of the Secretary's analysis and response to the public comments appears in the Federal Register, in pertinent part:

> *Comment:*  Several commenters were concerned with the inclusion . . . of expansion waiver days in . . . the Medicare DSH adjustment calculation. States without a Medicaid expansion waiver in place believed that States that did have a Medicaid expansion waiver in place received an unfair advantage. In addition, comments from Pennsylvania hospitals supported the continued inclusion of general assistance days in . . . the Medicare DSH adjustment calculation as well as expansion waiver days. . . .
>
> *Response:*  While we initially determined that States under a Medicaid expansion waiver could not include those expansion waiver days as part of the Medicare DSH adjustment calculation, we have since consulted extensively

---

[27] MedPAC "is an independent federal body established by the Balanced Budget Act of 1997 (P.L. 105-33) to advise the U.S. Congress on issues affecting the Medicare program."  MedPAC report, RR 205 (doc. no. 75 at 160).  MedPAC:  "In past years, Medicare's fiscal intermediaries have counted general assistance days in calculating hospitals' low-income shares, at least partly because they are sometimes administratively indistinguishable from true Medicaid days."  Id., RR 303 (doc. no. 75 at 258).  MedPAC recommended:  "Congress should reform the [Medicare DSH] adjustment to: . . . include the costs of all poor patients in calculating low-income shares . . . and . . . use the same formula to distribute payments to all hospitals covered by prospective payment."  Id.  Also, this "approach would eliminate the controversy created by the states' general assistance programs" because "it would no longer matter whether patient days emanated from a jointly funded or a state-only program."  Id., RR 304 (doc. no. 75 at 259).

with Medicaid staff and have determined that Section 1115 expansion waiver days are utilized by patients whose care is considered to be an approved expenditure under Title XIX.  While this does advantage States that have a Section 1115 expansion waiver in place, these days are considered to be Title XIX days by Medicaid standards.

* * *

General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program. . . . While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid-eligible under the State plan and are not considered Title XIX beneficiaries.  Therefore, Pennsylvania and other States that have erroneously included these days in the Medicare disproportionate share adjustment calculation in the past, will be precluded from including such days in the future.

Final rule, 65 Fed. Reg. 47054, 47086-87, RR 46, 78-79 (doc. no. 75 at 1, 33-34).

Several Pennsylvania hospitals[28] commented on the January 20, 2000 interim final rule that unfavorably contrasted non-Medicaid-eligible GA patients and non-Medicaid-eligible Section 1115 patients.  Pa. hospital comments, RR 5-45 (doc. no. 74 at 5-45).  Comments by Hospital & Health System Association of Pa. (HAP) – a seemingly objective authority – presented questions central to this litigation.[29]

─────────────────────

[28] Altoona Hospital; DuBois Regional Medical Center; St. Joseph's Hospital, North Philadelphia Health System; Temple University Health System; The Uniontown Hospital; University of Pennsylvania Health System; and The Washington Hospital.

[29] "The . . . rule essentially provides two reasons for . . . including expansion waiver days in the DSH calculation.  First, . . . one purpose of an expansion waiver under Section 1115 is to extend federal matching payments under Title XIX 'to services furnished to populations that otherwise could not have been made eligible under Medicaid.'  65 Fed. Reg. 3137. . . . Second, . . . allowing hospitals to include inpatient hospital days for expanded eligibility groups in the Medicare DSH adjustment 'is fully consistent with the Congressional goals' in providing the DSH adjustment 'to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid.'  Id."

* * *

"These reasons . . . apply with equal, if not greater, force to Pennsylvania general assistance days that have historically been included in the Medicare DSH calculation by hospitals and intermediaries.  In amending the regulation to include expansion waiver days, [CMS] relied on the language in Section 1115

Discussion

Defendant's rulemaking and reimbursement decisions are reviewed under the standards of the APA, 5 U.S.C. §§ 701-706.  Under the APA "we 'hold unlawful and set aside agency action, findings, and conclusions' that are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  CBS Corp. v. FCC, 663 F.3d 122, 137 (3d Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)),  cert. denied, 132 S. Ct. 2677 (U.S. June 29, 2012); Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Ins. Co., 463 U.S. 29, 41 (1983) (agency standards promulgated under the informal rulemaking procedures of § 553 of the APA governed by § 706(2)(A)).  See also Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 280-82, 284 (3d Cir. 2002) (APA governed review where the broad deference of Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) applied to the agency's Medicare policy guidelines).

---

(cont.) indicating that state demonstration project costs can be treated as Medicaid expenditures for purposes of federal matching payments.  Yet Section 1115 nowhere states that a patient group otherwise ineligible for Medicaid that receives health care under the demonstration project are to be treated as a Medicaid eligible group; instead, the statute merely refers to treatment of demonstration project costs as expenditures under the state plan."

*   *   *

"Indeed, we believe that in some respects a better case can be made for including Pennsylvania general assistance days in the Medicare DSH calculation than for including expansion population days under a state demonstration project. . . . By definition, an expansion waiver under Section 1115 is not part of a state plan approved under Title XIX – it is a waiver of certain required state plan provisions under Title XIX. . . . In contrast, . . .  payments to Pennsylvania hospitals based on patient days for general assistance recipients are part of Pennsylvania's approved Medicaid state plan, qualify for Federal matching payments pursuant to Title XIX, and do not require a waiver of required state plan provisions under Title XIX."

HAP comments, RR 27-28, 28-29 (doc. no. 74 at 27-28, 28-29) (emphasis in original).

The scope of review of Constitutional questions is "more searching." CBS Corp., 663 F.3d at 137.  In cases involving equal protection of the laws, "we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification."  Biener v. Calio, 361 F.3d 206, 214 (3d Cir.) (Nygaard, J.) (citation and internal quotation marks omitted), cert. denied, 543 U.S. 817 (2004).  Equal protection "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992); FCC v. Beach Commc'n, Inc., 508 U.S. 307, 313-14 (1993) (primary inquiry is whether there is a rational basis for the challenged classification).  For standards and scope of review, see rulings Oct.16, 2012 mem. (doc. no. 66 at 3-11).

Here, defendant's reimbursement decisions were based in large part on Title 55 of Pennsylvania's administrative code that governs the state's medical assistance program.  In defendant's view, as set out in various regulations, GA hospital inpatients receive "health care services under a State-only approved and funded program."  Adm. supp. decision, SAR 41.  GA recipients are eligible for "state-only" benefits, including "[o]ne acute care inpatient hospital admission per fiscal year" – i.e., "only State-funded for this classification of patient" and "funded solely by State funds."  Id., SAR 37-38, 41 ("hospital is paid for covered GA inpatient services through a State-only funded payment").  Furthermore:  "State-only paid and funded" inpatient hospital services for GA patients "are not in the State plan, but rather are referenced and authorized by the State Code."  Id., SAR at 37.  "State-only" refers to the regulatory scheme and source of funding as characterized by defendant.

These assertions are not supported by substantial evidence or consistent with the public comments in the rulemaking record. See CBS Corp., 663 F.3d at 137 (agency action is arbitrary and capricious where "'an explanation . . . runs counter to the evidence'") (quoting State Farm, 463 U.S. at 43)). Each as well "'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Id. The cited state regulatory law is immaterial because SPA 94-08 governs here. See id. ("'agency has relied on factors which Congress has not intended it to consider'"). SPA 94-08 was misread by defendant – or not properly considered. See id. ("'entirely failed to consider an important aspect of the problem'").

Medicaid is "a cooperative program between the state and federal governments to provide medical assistance to those with limited financial resources." Lewis v. Alexander, 685 F.3d 325, 331 (3d Cir. 2012), cert. denied, 133 S. Ct. 933 (U.S. Jan. 14, 2013). State participation in the Medicaid program is voluntary. In order to qualify, a state must create a "state plan" for medical assistance consistent with the requirements of Section 1902 of the Act, 42 U.S.C. § 1396a, State plans for medical assistance. Lewis, 685 F.3d at 331-32; Cooper, 686 F. Supp. 2d at 486 (citing 42 C.F.R. § 430.10).[30] A state plan "must . . . provide that it shall be in effect in all political subdivisions of the State, and, if administered by them,

---

[30] "The State plan is a comprehensive written statement submitted by the [state Medicaid] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of Title XIX, the regulations . . . , and other applicable official issuances of the Department [HHS]. The State plan contains all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program." 42 C.F.R. § 430.10.

be mandatory upon them." 42 U.S.C. § 1396a(a)(1). Once a state elects to participate, it must comply with federal statutes, regulations, and standards – this includes conforming to its particular Medicaid state plan. See Lewis, 685 F.3d at 335, 342-43, 345-46 (Medicaid statute preempted conflicting state law requirements by virtue of the Supremacy Clause); Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 178-79 (3d Cir. 1995) (Supremacy Clause "compels compliance . . . with federal law and regulations").

In fiscal year 2002, Pennsylvania's Medicaid state plan contained SPA 94-08, and the plan, as amended, had been approved by CMS. As mandated by Section 1902 of the Act, 42 U.S.C. § 1396a(a)(13)(A)(iv), the plan was required to "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs." Id. This is what Pennsylvania did in SPA 94-08 – authorizing the payment of Medicaid funds under Sections 1903 and 1905 of the Act, 42 U.S.C. §§ 1396b, 1396d to acute care hospitals for inpatient services to medical assistance beneficiaries, including non-Medicaid-eligible GA inpatients.[31] Attachment 4.19A at 26, SAR 956; see also 42 C.F.R. § 430.10 ("plan contains all information necessary for . . . Federal financial participation").

Defendant abstracts a separate, more general category of Medicaid DSH under Pennsylvania's state plan as authorized by Section 1923 of the Act, 42 U.S.C. § 1396r-4(f)

---

[31] SPA 94-08: Adjustments are "paid in the normal medical assistance or intermediary payment process and according to rates or fees established by the Commonwealth for fee-for-service program services or by the intermediary for its services." Attachment 4.19A at 26, SAR 956. A state plan must provide "for a public process through which a state determines and sets reimbursements regarding DSH payments." Children's Seashore House v. Waldman, 197 F.3d 654, 656 (3d Cir. 1999) (citing 42 U.S.C. § 1396a(a)(13)(A)). See Coyle decl. ¶¶ 13, 18, 22-25, SAR 109-111; Piper report at 2-4, 9, SAR 132-134, 139.

(lump sum allotments paid to disproportionate share hospitals).  Adm. supp. decision, SAR

39-40 & n.39 (citing Attachment 4.19A at 16-17, SAR 918-921; 55 Pa. Code §§ 1163.24,

1163.67).  See Children's Seashore House v. Waldman, 197 F.3d 654, 656 (3d Cir. 1999) (§

1396r-4 "outlines the specifications" and "set the parameters for a state's provision of [these]

DSH adjustments"); Univ. of Wash. v. Sebelius, 634 F.3d 1029, 1037-38 (9th Cir. 2011)

(comparable general DSH provision).[32]  But this DSH provision is not at issue here.

Plaintiffs sought Medicare DSH adjustments for services provided under SPA 94-08

inasmuch as its plain terms permitted Medicaid DSH payments "in addition to . . .

disproportionate share payments described in other portions of this state plan."  Attachment

4.19A at 25, SAR 955.

Though noting SPA 94-08, defendant's explanation is that it "relates to an 'additional'

Medicaid DSH payment which is made for patients of Institutions for Mental Disease (IMD)

and is not a description of the foregoing general DSH formula."[33]  Adm. supp. decision, SAR

40 n.38.  There is no dispute but that SPA 94-08 extended DSH payments to institutions

providing mental health services for certain patients.  See Attachment 4.19A at 25, SAR 955

(IMD patients "also qualify").  However, that does not negate the accompanying grant of

---

[32] "Medicaid DSH adjustment consists of a State-specific statutory allotment that increases only with inflation. [42 U.S.C.] § 1396r-4(f).  This lump sum is not based upon or keyed to the number of patients served.  Id. . . . States are required to use it 'to take into account the situation of *hospitals* which serve a disproportionate number of low income patients with special needs.' Id. § 1396r-4(a)(1) . . . . Regardless of how the State chooses to distribute it to DSH hospitals, this money is *not* being paid on behalf of any specific individual for any specific service."  Univ. of Wash. v. Sebelius, 634 F.3d 1029, 1037-38 (9th Cir. 2011) (emphasis in original; footnote omitted).  See also def. supp. br. (doc. no. 79 at 18 & n.2, 20) (also mistaking the more general category of Medicaid DSH payments as germane).

[33] This may also account for the conclusion:  "The record did not contain that portion of the State plan concurrent with the cost year, which sets forth the Medicaid DSH formula contemporaneous with the cost year."  Adm. supp. decision, SAR 40.  But SPA 94-08 was in the record.

additional DSH payments to acute care hospitals for services to GA inpatients.  To this significant extent, defendant has disregarded SPA 94-08's other provisions.

Uncertainty about the contents of Pennsylvania's state plan may have led to other misconceptions.  Defendant asserts that a qualifying hospital's Medicaid DSH payment "is not a DRG payment based on the costs of a particular GA inpatient."  Adm. supp. decision, SAR 39 (citing 55 Pa. Code § 1163.67(i), (j) (DPW "will determine prospectively the annual [DSH] payment for each qualifying acute care general hospital . . . [and] divide the  annual . . . payment into 12 monthly payments")).  While this may be a fair synopsis of the more general DSH provision, it is not an accurate summary of SPA 94-08.  It sets forth eligibility criteria as to an individual inpatient's low-income status and the method for paying hospitals – on a per patient and per case, diagnostic-specific basis – according to the same rates used for Medicare-Medicaid beneficiaries.  Attachment 4.19A at 26, SAR 956.  And the funding mechanism for services to Medicaid and GA inpatients is also the same – federal matching payments under Sections 1903 and 1905 of the Act, 42 U.S.C. §§ 1396b, 1396d.

Pennsylvania's GA program is a creature of state law.  But for fiscal year 2002, the record does not show what effect, if any, the cited regulations had on the administration of SPA 94-08.[34]  Moreover, the regulations cited to support the "state-only" rationale are put

---

[34]  The most obvious example of pertinent state regulation – DPW's administration of the federal eligibility criteria as to an inpatient's low-income status – is not at issue here.  See Attachment 4.19A at 25, SAR 955 (applicants must "demonstrate to [DPW] that their household income and resources do not exceed the income and resource standards established by [DPW] such standards being equal to or more restrictive than those for the Aid to Families with Dependent Children  (AFDC) program").

forth primarily in the inapposite context of the more generalized DSH provision.  Adm. supp.

decision, SAR 37-41.  For the most part, the regulations were adopted before October 12,

1995, the date of CMS's approval of SPA 94-08.  Some were amended after SPA 94-08

became retroactively effective to October 30, 1994.  But none of the amended regulations

had an effect on SPA 94-08 – with an exception referred to by defendant as particularly

important:  the one-day annual limit on inpatient hospital stays for GA recipients.  Id., SAR

37, 41, 43.  Defendant:  "GA patients are eligible for a state-only benefit which includes

certain limited hospital services," which "may be considered to be overly restrictive."  Id.,

SAR 37, 43.  However, the one-day limitation was not in effect until 2005.  During fiscal

year 2002, hospital inpatient services were not so limited.  See Dept. of Public Welfare, 35

Pa. Bulletin 4811 (No. 35 Aug. 27, 2005); 55 Pa. Code §§ 1101.31(e)(iv)(A),

1101.31(f)(1)(i) (as amended effective Aug. 29, 2005).[35]

Here, the distinctions made in the agency's rulemaking and reimbursement decisions

do not justify the disparate treatment of two groups of hospitals – hospitals in Pennsylvania

that serve GA inpatients under SPA 94-08 versus hospitals in other states that also serve non-

Medicaid-eligible, low-income inpatients under a Section 1115 waiver.  "A classification

such as this one 'must be reasonable, not arbitrary, and must rest upon some ground of

difference having a fair and substantial relationship to the object of the legislation, so that

---

[35] Furthermore, the Medicare DSH regulation did not require any specific level of hospital coverage. It required only that patients be eligible for "medical assistance" or "inpatient hospital services" for one day to be counted in the Medicare DSH calculation.  42 C.F.R. § 412.106(b)(4)(i) (2002) & (2003), respectively. The only GA days that plaintiffs ask to be included in the Medicare DSH calculation are days in which they actually provided hospital services to inpatients eligible for care under SPA 94-08.  See pls. supp. br. (doc. no. 77 at 38-40).

all persons similarly circumstanced shall be treated alike.'" <u>Medora v. Colautti</u>, 602 F.2d 1149, 1152 (3d Cir. 1979) (quoting <u>Reed v. Reed</u>, 404 U.S. 71, 76 (1971)).  In <u>Medora</u>, the state agency's regulatory classification contravened the equal protection clause because it "ignore[d] the common denominator of need, and create[d] a classification that bears no relation to the legislatively declared purpose of the general assistance program."  <u>Id.</u>  <u>See</u> <u>Muwekma Ohlone Tribe v. Kempthorne</u>, 452 F. Supp. 2d 105, 115-16 (D.D.C. 2006) (equal protection inquiry was whether the agency proffered a rational basis for requiring an Indian tribe to adhere to regulatory procedures while exempting other similarly situated tribes).

That defendant's classification had a significant adverse financial impact on plaintiff hospitals is undisputed.  In the August 1, 2000 final rule, the Secretary acknowledged receipt of public comments from 11 hospitals that expressed their concerns:  "States that did not have a Medicaid expansion waiver in place received an unfair advantage," and "comments from Pennsylvania hospitals supported the continued inclusion of general assistance days in . . . the Medicare DSH adjustment calculation as well as waiver days."  65 Fed. Reg. 47054, 47086 (Aug. 1, 2000),  RR 78 (doc. no. 75 at 33).  Defendant's response was brief:  "While this does advantage States that have a Section 1115 expansion waiver in place, these days are considered to be Title XIX days by Medicaid standards."[36] <u>Id.</u> at 47087, RR 79 (doc. no. 75 at 34).  But simply noting this does not justify why hospitals such as plaintiffs were treated differently.

---

[36] SPA 94-08 and the comments from Pennsylvania hospitals appear to have been disregarded: "General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program."  65 Fed. Reg. 47054, 47087 (Aug. 1, 2000), RR 79 (doc. no. 75 at 34).

On remand, defendant found as "a matter of law" that "GA patients and Section 1115 patients are not the same." Adm. supp. decision, SAR 41, 43, 41-47. Also, the "category of patients, the services covered, the means of financing to maintain budget neutrality, the delivery system, and impact on other parts of the state plan reflect[ ] that these plan[s] are separate and distinct from each other and not interchangeable, as in 'but for the lack of a waiver approval' similarity." Id., SAR 47.

One such distinction made by defendant is that the patient populations are different. Adm. supp. decision, SAR 41. As to Pennsylvania's GA inpatients: "State-only inpatients are just that – patients receiving support for health care services under a State-only approved and funded program." Id., SAR 41. And "the funding source[s] for Section 1115 patients and the GA patients . . . are not the same, but separate and distinct methods of financing." Id., SAR 42. This also seems inapt. The talisman of "state-only" does not overcome the substantial evidence that during fiscal year 2002, SPA 94-08 was contained in Pennsylvania's CMS-approved Medicaid state plan. Under that plan amendment, inpatient hospital services were funded with federal matching funds – the same source of funds as used for Medicaid services and Section 1115 waiver projects.

Another difference as to patient populations: "Section 1115 patients are part of an expanded population whose care is considered an approved Federal expenditure under Medicaid. . . . [T]he costs associated with the populations are matched based on Section 1115

authority."  Adm. supp. decision, SAR 41.  In this litigation,[37] defendant says that unlike

Section 1115 waivers, "no statute vests in the Secretary the authority to depart from the rule

that patients must be 'eligible for Medicaid' in order to be included in the Medicare DSH

calculation."  Def. supp. reply br. (doc. no. 83 at 14).  "There is no [statutory] basis for the

Secretary to exercise her discretion . . . broadly enough to include GA patients."  Id.

Defendant's argument emphasizes Subchapter XI, Section 1115 of the Act, 42 U.S.C.

§ 1315.  But it discounts evidence of record that under SPA 94-08 inpatient hospital services

for Pennsylvania's GA patients was specified by the authority of Subchapter XIX, Section

1902 of the Act, 42 U.S.C. § 1396a (Medicaid state plans).  Neither the inpatients nor the

hospital services made available under SPA 94-08 in contrast to Section 1115 waiver

programs differ significantly – except as to the hospital's statutory path to federal matching

funds.  It is unclear why one route should be viewed as more authoritatively supported or

administratively desirable than the other.

Section 1115 empowers the Secretary to waive specific requirements of the Act,

including those for a state's Medicaid plan, for "any experimental, pilot, or demonstration

project which, in the judgment of the Secretary, is likely to assist in promoting the objectives

of Subchapter . . . XIX [Medicaid] . . . ."  42 U.S.C. § 1315(a)(1).  And the "costs of such

project . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as

---

[37]  "'[P]ost hoc' rationalizations . . . have traditionally been found to be an inadequate basis for review" of agency action.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971); Rite Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 850-51 (3d Cir. 1999) (district court properly refused to base its review on post hoc rationalization made by agency after it took disputed action).

expenditures" under the state plan.  Id. § 1315(a)(2)(A).  Other than this language, the statute

contains no procedure or criteria for decision-making that the Secretary must follow in

approving a waiver project.  On the surface, the statute can be read to suggest that Congress

delegated a "total" and "unfettered" discretionary power – as defendant candidly asserts here.

See, e.g., def. supp. reply br. (doc. no. 83 at 13).  Nevertheless, detailed regulations have

been promulgated governing waiver projects.  See 42 C.F.R. § 430.25, Waivers of State plan

requirements.

Under Subchapter XIX – Medicaid – specific statutory and regulatory requirements

must also be met for approval of a state plan or a plan amendment that serves as a basis for

federal financial participation.   See 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10-430.20

(submittal, review, and effective dates of state plans and plan amendments).  Under SPA 94-

08, payments are made directly to a hospital as part of the state Medicaid program – no

waiver of state plan requirements is required.  See HAP comments, RR 28-29 (doc. no. 74

at 28-29) ("Indeed . . . a better case can be made for including Pennsylvania general

assistance days in the Medicare DSH . . . . [A]n expansion waiver under Section 1115 is not

part of a state plan . . . it is a waiver of certain required state plan provisions . . . .").  See also

pls. supp. br. (doc. no. 77 at 22-24, 26-28) (excerpts of comments by Pa. hospitals).

As to issues of federal and state sovereignty, "state-only" also refers to the choice to

undertake the costs and burdens of a particular medical assistance program.  Defendant:  the

"eligibility criteria for . . . Section 1115 populations are federally approved and set forth in

the terms and conditions of the . . . project."  And "the Section 1115 waiver has been reviewed and approved by the Federal government as likely to assist in promoting the objectives of Medicaid."  Id., SAR 41-42.  "No such Federal determination has been made with respect to a State-only program."  Id., SAR 42; see also def. supp. br. (doc. no. 79 at 21) ("State-only GA benefits . . . are created, determined, and administered exclusively by the State . . . with absolutely no oversight or involvement from the federal government.").

SPA 94-08, however, is not limited to a "state-only" program.  It is an essential part of the Medicaid system and subject to CMS's oversight.  CMS reviewed and approved the eligibility criteria and other terms set forth in that state plan amendment.  It determined that the objectives of the Medicaid statute were promoted by authorizing under SPA 94-08 "additional payments to meet the needs of those facilities which serve a large number of Medicaid and medical assistance eligible, low[-]income patients, including those eligible for general assistance, who[m] other providers view as financially undesirable."  Attachment 4.19A at 25, SAR 955.

Another difference according to defendant:  "State-only programs may offer no, or varying levels of payment for health care services . . . , which vary even from county to county or municipal jurisdiction within a state."  Adm. supp. decision, SAR 41, 43 ("services provided and eligibility criteria widely vary"), 43-45 (itemizing the "complexity and unique nature" of GA benefits – mostly other than inpatient services).  But in fiscal year 2002, SPA 94-08 applied statewide rates for unlimited inpatient hospital services that had been

developed according to nationwide, CMS-approved Medicare DRG rates.  See 42 U.S.C. § 1396a(a)(1) (state plan "shall be in effect in all political subdivisions of the State").

Furthermore, Section 1115 waiver projects share with state plans a lack of uniformity in their diverse medical assistance benefits.  See 42 C.F.R. §§ 430.25(d)(1), 430.25(d)(2)(i)-(iii) (waiving Medicaid requirements for "Statewideness," "Comparability of services," and "Income and resource rules"); 68 Fed. Reg. 27154, 27207 (May 19, 2003) ("we have become aware that there are certain Section 1115 demonstration projects . . . with benefit packages so limited that the benefits are not similar to . . . a Medicaid State Plan"); pls. supp. br., listing examples (doc. no. 77 at 39 & n.32) ("CMS routinely approves State Plans that limit the total number of days of inpatient care payable for traditional Medicad patients"); pls. submission on remand, SAR 98-99 & n.13 (same).  The record also contains evidence that many waiver projects in practice "are, or soon evolve into indefinite, alternative models under which medical assistance services not otherwise eligible for FMAP [federal medical assistance payments] under Section 1903 [Medicaid, 42 U.S.C. § 1396b] are federally funded," and "[i]n effect, they have become simply a reasonably routine alternative to providing medical assistance through a typical State Plan."  Piper report at 5, SAR 135.

An additional distinction:  Section 1115 waiver projects must be "budget-neutral" – waiver applicants must demonstrate to CMS that their proposals will not lead to increased federal Medicaid expenditures.  Adm. supp. decision, SAR 42.  The record shows that states may and commonly do reallocate unspent Medicaid DSH funds to their expansion projects

in order to demonstrate budget neutrality.  See, e.g., Piper report at 6, SAR 136.  SPA 94-08 differs in this respect – hospitals are paid directly with federal matching funds.  But as a part of Pennsylvania's state plan, it was budget-neutral by definition – and CMS reviewed and approved its prospective expenditures and their likely impact on the Medicaid program.

On remand, defendant did not reconsider SPA 94-08 or the reasons given for amending the implementing regulation, 42 C.F.R. § 412.106(b)(4) (2000).  That regulation permitted all inpatient hospital days funded under a Section 1115 waiver project to be counted in the Medicare DSH calculation – regardless of a patient's eligibility for Medicaid. As stated by the Secretary in 2000, the purpose was to compensate providers through federal matching payments for costs of services furnished to Section 1115 expansion populations who could not otherwise have been made eligible for Medicaid.  The Secretary found that allowing hospitals to include Section 1115 patients in the Medicare DSH

> is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid.  Therefore, inpatient hospital days for these individuals eligible for Title XIX matching payments under a Section 1115 waiver are to be included as Medicaid days for purposes of the Medicare DSH adjustment calculation.

Interim final rule, 65 Fed. Reg. 3136, 3137 (Jan. 20, 2000), RR 2 (doc. no. 74 at 2); see also final rule, 65 Fed. Reg. 47054, 47086-47087 (Aug. 1, 2000), RR 78-79 (doc. no. 75 at 33-34).[38]  Furthermore, the Secretary stated:

---

[38]  The Secretary:  "[W]e revised the policy . . . to allow hospitals to include the patient days of all populations eligible for Title XIX matching payments in a State's Section 1115 waiver in calculating the hospital's Medicare DSH adjustment." 65 Fed. Reg. 47054, 47086 (Aug. 1, 2000), RR 78 (doc. no. 75 at 33).

> We believe this regulation meets Federalism requirements as it does not increase the burden on States and is responsive to requests from hospitals who partner with States in providing health services to needy populations.

Interim final rule, 65 Fed. Reg. at 3139, RR 4 (doc. no. 74 at 4).

Defendant acknowledges that allowing Medicare DSH credits for Section 1115 waiver populations furthers public policies underlying the waiver statute and may encourage states to "adopt innovative programs that promote the objectives of Medicaid." Def. supp. br. (doc. no. 79 at 38-39). Other interests and values are involved as well.

Section 1115 projects may occur on a more or less extensive waiver of Medicaid statutory requirements – in Delaware, for example, Medicaid has been effectively dismantled in favor of an ongoing, statewide medical assistance waiver program.[39] The Secretary is empowered to determine whether the program "promotes the objectives of Medicaid." Yet an adequate explanation has not been given for crediting hospitals in states that have obtained Medicaid waivers with significant Medicare DSH funds, whereas similar hospitals in states that have chosen to participate in Medicaid, such as plaintiffs, are refused those funds. Medicare DSH adjustments are not only an incentive, but also a financial necessity for hospitals that lose money in providing services to more, even lower-income, non-Medicaid-eligible patients than those served by waiver projects. Patients ultimately suffer. St. Agnes

---

[39] "Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of beneficiaries. Waivers . . . permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguards for the protection of beneficiaries and the program." 42 C.F.R. § 430.25(b).

hospital "depended heavily on Medicare DSH adjustments for its financial viability," but the "provision of large amounts of charity and below cost care contributed to its eventual demise." Coyle decl. ¶¶ 37, 40-41, SAR 114-115.

Defendant also refers to the Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, § 5002, 120 Stat. 31 (Feb. 8, 2006), 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (2007). Section 5002 amended the Medicare DSH statute[40] and ratified the January 20, 2000 interim final rule as well as certain regulations promulgated in 2003.[41]  The ratification was narrow: "insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under Title XI of the Social Security Act . . . under [the Medicare DSH statute]."  Id. § 5002; see also footnote 40, § 5002's amendment of the Medicare DSH ("Secretary may . . . include patient days of patients not so eligible).  In defendant's estimate, this ratification supports the decision to exclude from the Medicare DSH calculation days of inpatient hospital services for GA patients.  Adm. supp. decision, SAR 49 & n.52.

As ratified, the January 20, 2000 interim final rule was based on the Secretary's paraphrase of Section 1115: "costs of such project which would not otherwise be included

---

[40]  Section 5002 amended the Medicare DSH statute by adding, in part:  "In determining under subclause II the . . . [Medicare DSH payment] . . . the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible [for medical assistance under a State plan approved under Title XIX] but who are regarded as such because they receive benefits under a demonstration project approved under Title XI."  Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, § 5002, 120 Stat. 31 (Feb. 8, 2006) (amending 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).

[41]  Regulations ratified by § 5002:  "January 20, 2000, at 65 Federal Register 3136 et seq." and "August 1, 2003, at 68 Federal Register 45345 et seq."

as expenditures under [Medicaid, Section 1903 of the Act, 42 U.S.C. § 1396b] shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures . . . approved under (Title XIX)."  65 Fed. Reg. 3136, 3137 (Jan. 20, 2000), RR 2 (doc. no. 74 at 2); cf. 42 U.S.C. § 1315(a)(2)(A) (stating instead, "approved under a State plan"). Defendant construed that statutory phrase as "allow[ing] . . . the expansion populations to be treated as Medicaid beneficiaries."[42]  65 Fed. Reg. at 3137.  In addition, the Medicare DSH statute was construed to allow days of inpatient hospital services for waiver patients "to be included as Medicaid days for purposes of the Medicare DSH  adjustment calculation."  Id.

This narrow finding does not help to reconcile why under Pennsylvania's SPA 94-08 inpatient hospital services for GA patients are not includable in the Medicare DSH.  Section 5002 does not preclude recognition of those days as Medicaid days.  Congress' endorsement is consistent with plaintiffs' position – the Secretary could and should have eliminated from the August 1, 2000 final rule the distinction between days of inpatient hospital services under SPA 94-08 and those under Section 1115 projects.  Pls. reply br. (doc. no. 80 at 33-35).

Defendant further contends that § 5002 – without its expressly saying so – affirmed the entirety of the January 20, 2000 interim final and August 1, 2000 final rules, including a rule that days of hospital services for GA inpatients shall not be counted.  Def. supp. br.

---

[42] Defendant asserts:  "Congress . . . specifically authorized by statute that expansion populations such as Section 1115 Waiver patients are to be treated as Medicaid beneficiaries."  Def. supp. br. (doc. no. 79 at 22) (citing Section 1115 of the Act, 42 U.S.C. § 1315).  The Secretary – not Congress – made that interpretation of the waiver statute.  By its plain language, Section 1115 applies to the "costs of such [waiver] project."  42 U.S.C. § 1315(a)(2)(A).  It is silent about "beneficiaries."

(doc. no. 79 at 14-15 & n.2).[43]  This misreads § 5002 – which is silent as to whether days of inpatient hospital services for GA patients should be excluded from the Medicare DSH calculation.  It does not mention PM A-99-62, which prohibited hospitals from counting GA days after fiscal year 1999.  Defendant acknowledges this:  DRA "left untouched CMS['s] longstanding policy on general assistance days." Adm. supp. decision, SAR 50.  Defendant still has discretion to allow days of hospital services for GA inpatients under SPA 94-08 to be included as Medicaid days for purposes of the Medicare DSH calculation.

Here, the extraordinary discretionary power granted under Section 1115, as ratified by § 5002 of the DRA, has been unduly underscored by defendant.  It is not an unfettered power to selectively "deem" non-Medicaid-eligible populations – Section 1115 patients – to be Medicaid-eligible individuals:  "GA patients are not Medicaid eligible, while expansion populations under Section 1115 Waiver programs are deemed Medicaid elgibile."[44]  Def.

---

[43]  Also, defendant: "Congress went so far as to specifically ratify the particular regulations in which the Secretary exercised her discretion to include Section 1115 Waiver beneficiaries in the Medicare DSH calculation."  Def. supp. reply br. (doc. no. 83 at 13-14).  "Congress granted the Secretary unfettered discretion under the [DRA] to decide whether or not to include Section 1115 Waiver days in the Medicare DSH calculation."  Id. (doc. no. 83 at 2).  The DRA "makes clear that the Secretary has total discretion to include or not to include in the Medicare DSH calculation beneficiaries not eligible for traditional Medicaid 'but who are regarded as such because they receive benefits under a demonstration project approved under Title XI.'"  Id. (doc. no. 83 at 13) (quoting § 5002); def. supp. br. (doc. no. 79 at 14, 39 n.12) (same).

[44]  The theory that Section 1115 patients are "deemed" Medicaid-eligible has its origins in the regulations implementing the Medicare DSH statute.  As amended in 2003, the regulation read:

> [F]or purposes of this computation [Medicare DSH], a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under Section 1115(a)(2) of the Act [42 U.S.C. § 1315(a)(2)] on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

42 C.F.R. § 412.106(b)(4)(i) (2003).  See also:  68 Fed. Reg. 27154, 27229 (May 19, 2003); 68 Fed. Reg. 45346, 45470 (Aug. 1, 2003).  "Deemed eligible for Medicaid" is not to be found in the Medicare DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi), or in Section 1115 of the Act, 42 U.S.C. § 1315. Section 5002 of the DRA uses the phrase:  "patients not so eligible but who are regarded as such."

supp. br. (doc. no. 79 at 32) (emphasis in original).  This misses the point.  Defendant's statutory interpretation of Section 1115 is not the issue.  And whether Section 1115 expansion patients may permissibly be "deemed" to be Medicaid-eligible individuals also need not be decided.  Many expansion hospital inpatients are ineligible for medical assistance under the Medicaid statute.  Yet, without regard to their greater income and lesser need, days of hospital services for them may be counted in the Medicare DSH.

The Medicare DSH rules are not a matter of unlimited discretion.  Under Section 1115, Congress granted discretion to waive statutory requirements for a state's Medicaid plan, but not to waive requirements of the Medicare statute.  See 42 U.S.C. § 1315(a) (delegated waiver power not extended to Subchapter XVIII, Medicare).  Perhaps the best illustration of this is the Secretary's recognition of Section 1115 waiver patients as Medicaid beneficiaries for purposes of the Medicare DSH.  See the January 20, 2000 interim final and August 1, 2000 final rules that led to the amended regulation, 42 C.F.R. § 412.106(b)(4) (2000), and its progeny.

But those regulations expressed two opposing views of the Medicare DSH statute's requirement that patients be "eligible for medical assistance under a State plan approved under Subchapter XIX . . . ."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  One interpretation:  a patient's eligibility for Medicaid as statutorily defined is strictly required.  The other:  a patient's eligibility for Medicaid is not required if the patient were regarded as Medicaid-eligible based on the Secretary's construction of Section 1115 of the Act, 42 U.S.C. § 1315.

Whether considered vis-a-vis the APA's standards for lawful agency action or the Constitution's guarantee of equal protection, the record does not disclose a rational basis for defendant's rulemaking or adverse reimbursement decisions.  Defendant has not satisfactorily articulated why plaintiffs' non-Medicaid-eligible GA hospital inpatients should not also be regarded as Medicaid beneficiaries for purposes of the Medicare DSH calculation.  Under SPA 94-08, the costs of inpatient hospital services for non-Medicaid-eligible GA inpatients are not to be regarded as Medicaid expenditures.  They are expenditures under Pennsylvania's CMS-approved state plan – and payable with federal matching funds.  The record does not show any significant differences in costs, rates of payment, services, types of hospital inpatients, or the reporting of costs as among Pennsylvania's state plan amendment SPA 94-08 and other Section 1115 waiver projects.  On this record, plaintiff hospitals in all relevant respects are indistinguishable from other hospitals in Section 1115 waiver states.

An order accompanies this memorandum.


BY THE COURT:

/s/ Edmund V. Ludwig
Edmund V. Ludwig, J.

35